**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:05-cr-00397-KJD-PAL |
| | ) | |
| vs. | ) | |
| | ) | **REPORT OF** |
| JOSE RODRIGUEZ, | ) | |
| | ) | **FINDINGS AND RECOMMENDATION** |
| Defendant. | ) | |
| | ) | (M/Suppress - #25) |

This matter is before the Court on Defendant Jose Rodriguez's ("Rodriguez") Motion to Suppress (#25) which was referred to the undersigned for Findings and Recommendations pursuant to 28 U.S.C. § 636(b)(1)(B), and LR IB 1-3 and IB 1-4.  The Court has considered the motion, the Government's Response (#34), Rodriguez's Reply (#36), Rodriguez's Supplemental Briefing to the Points and Authorities to the Motion to Suppress (#37), the government's Supplemental Points and Authorities Regarding Motion to Suppress (#38), Rodriguez's Addendum to Issue Raised During Evidentiary Hearing (#40), the government's Response to Defendant's Addendum to Issue Raised During Evidentiary Hearing (#42), evidence adduced at the Evidentiary Hearing conducted August 18, 2006, and the transcript of the hearing filed September 6, 2006 (#44).

**BACKGROUND**

Rodriguez is charged in a criminal indictment returned October 19, 2005, with two counts of unlawful possession of a firearm by a convicted felon in violation of 18 U.S.C. § 921(g)(1).  The indictment also contains forfeiture allegations.  A superseding indictment was returned on March 15, 2006, adding an additional count of possession of an unregistered silencer in violation of 26 U.S.C. § 5861(d).  The indictments arise out of an automobile traffic stop on October 8, 2005, in Lake Mead National Recreation Area on Northshore Road near mile marker 34.5 conducted by Ranger Gunderson,

1    a law enforcement officer employed by the National Park Service assigned to Lake Mead.  Rodriguez

2    seeks to suppress two firearms, marijuana and a marijuana pipe with residue discovered by law

3    enforcement officers during the traffic stop, and all statements made by Rodriguez to law enforcement

4    officers in connection with the traffic stop.

5    **I.      The Parties' Arguments**

6           Rodriguez concedes that there was probable cause to conduct a traffic stop of the vehicle he was

7    driving.  However, Rodriguez challenges the vehicle stop and questioning by a law enforcement officer

8    as lacking in reasonable suspicion that Rodriguez was driving under the influence of drugs and/or

9    alcohol ("DUI").  Rodriguez contends that the traffic violations for which he was stopped on their own,

10   without any further indicators of intoxication, do not support reasonable suspicion of a DUI.  Rodriguez

11   points out that the law enforcement officer did not detect an odor of alcohol on his breath or detect open

12   containers of alcohol.  Rodriguez argues that at this point the investigation should have terminated and

13   that Ranger Gunderson impermissibly expanded the scope of the investigation by ordering Rodriguez

14   out of the vehicle, and asking Rodriguez to open an ice chest and tackle box for inspection.  Rodriguez

15   argues that these requests did not further a DUI investigation, and notes that the law enforcement officer

16   did not conduct a field sobriety test or a preliminary breath test.  Rodriguez's written motion disputes

17   that a firearm Ranger Gunderson discovered was in plain view, and that the orange bag in which it was

18   found was open.  Finally, Rodriguez argues that he invoked his right to remain silent when he stated

19   words to the effect he was "good for tonight" after being <u>Mirandized</u>, and asked whether he was willing

20   to talk.    Rodriguez asserts that questioning after he made this response violated his <u>Miranda</u> rights and

21   requires suppression of his incriminating statements.

22          The government responds that Ranger Gunderson had ample probable cause to conduct an

23   investigatory traffic stop.  The government disputes the defendant's argument that a law enforcement

24   officer may not conduct a DUI investigation for a traffic violation alone, and points out that Ranger

25   Gunderson observed additional indicators of intoxication, including Rodriguez's nervous behavior,

26   profuse sweating, and his failure to produce his proof of insurance and vehicle registration.  The

27   government argues that Ranger Gunderson intended to conduct field sobriety tests, but when he learned

28   from dispatch that Rodriguez was a felon, decided first to inspect the bed of Rodriguez's truck to ensure

2

1   that Rodriguez did not have ready access to weapons.  When he discovered the firearm in the orange

2   bag in plain view, Ranger Gunderson abandoned the DUI investigation and returned to his patrol

3   vehicle to radio for assistance.  In addition, the government contends that Rodriguez was informed of

4   his Miranda rights, but did not invoke them, and that his response to the effect he was "good for

5   tonight" was ambiguous at best.  Citing the Supreme Court's decision in Davis v. United States,

6   512 U.S. 452 (1994), the government asserts a law enforcement officer may continue to question a

7   suspect until and unless he clearly requests counsel.  Finally, the government argues that the circuits

8   which have decided the issue have applied the Davis rationale to a suspect's right to remain silent.

9   Thus, a law enforcement officer may continue to question a suspect until and unless he unambiguously

10   asserts his right to remain silent.

11        In his Reply, Rodriguez argues that Ranger Gunderson impermissibly expanded the scope of the

12   investigation by searching the bed of the truck, and that Ranger Gunderson's initial contact with

13   Rodriguez should have dispelled his belief that Rodriguez was intoxicated.  Rodriguez also argues that

14   Ranger Gunderson did not have reasonable suspicion to believe Rodriguez was dangerous and could

15   gain immediate control of weapons that would permit him to conduct a "protective sweep."  Finally, he

16   asserts that his statement about being "good for tonight" was a clear invocation of his rights.  Rodriguez

17   filed a supplement further supporting his argument that he unambiguously asserted his right to remain

18   silent.  The supplement argues, in the alternative, that if the court construes his statement as ambiguous,

19   the court should find that the law enforcement officers were required to narrowly tailor their questions

20   to resolve the ambiguity consistent with Ninth Circuit precedent predating Davis v. U.S.  He reasons

21   that in the Miranda v. Arizona decision, the Supreme Court distinguished between the right to remain

22   silent and the right to have an attorney, giving greater procedural safeguards to the right to have an

23   attorney present.  Rodriguez points out that once a suspect invokes the right to counsel, all questioning

24   must cease until counsel has been provided, unless the accused himself initiates the conversations with

25   police.  However, officers are not required to cease all questioning when a right to remain silent is

26   invoked, only the line of questioning the suspect did not want to discuss when the right was asserted.

27   (Supplement (#37) 7:11-13, citing Michigan v. Mosley, 423 U.S. at 103-04.)  Although difficult to

28   follow, he appears to argue that because there are less procedural safeguards given when an accused

1  invokes his right to remain silent, the court should require officers to clarify an ambiguous response

2  where the right to remain silent is at issue.  Finally, he asserts the Supreme Court's subsequent decision

3  in <u>Dickerson v. United States</u>, 530 U.S. 428 (2000), "suggests the need to re-evaluate <u>Davis</u> regarding

4  its continued applicability."  <u>Id.</u>, 9:21-23.

5       The government's Supplemental Points and Authorities largely reiterate the argument in its

6  Response that Ranger Gunderson properly seized a firearm that he observed in plain view in the open

7  bed of a pickup truck during a lawful traffic stop.  It additionally argues that Rodriguez was advised of,

8  but did not assert, his <u>Miranda</u> rights.

9       In his Addendum filed after the evidentiary hearing, Rodriguez argues that Ninth Circuit case

10  law allows officers to ask questions to clarify an ambiguous invocation of his right to remain silent, but

11  requires officers to stop general interrogation if a suspect ambiguously invokes his right to remain

12  silent.  He contends that the Ninth Circuit's holding that an officer has a duty to stop general

13  interrogation after receiving an equivocal invocation of one's right to remain silent in <u>Nelson v.</u>

14  <u>McCarthy</u>, 637 F.2d 1291 (9th Cir. 1980) has not been overruled.

15       The government filed a Response to Defendant's Addendum in which it argues that <u>Nelson</u> and

16  other Ninth Circuit cases Rodriguez relies on have been overruled by <u>Davis</u>, and asserts the distinction

17  Rodriguez draws between the <u>Miranda</u> right to remain silent, and to have counsel present "makes no

18  sense."  (Resp. to Addendum at 1:26.)

19  **II.     Evidence Before the Court**

20       Rodriguez's Reply (#36) attached Ranger Gunderson's supplemental incident report as

21  Exhibit "A."  Exhibit "B" to the Reply is a transcript of radio communications on the date of the stop

22  prepared by an investigator for the Federal Public Defender's Office.  Exhibit "C" is the affidavit of the

23  investigator stating she transcribed a copy of the radio communications between dispatch and the

24  rangers of the National Park Services pertaining to this incident, and that the transcription was done to

25  the best of her ability.  The audio tape itself was admitted in evidence as Exhibit "H" after portions of it

26  were played during the testimony of dispatcher, Robert Mitchell.  During the evidentiary hearing, the

27  government marked as Exhibit "1," a clear plastic bag containing objects identified on the record.  The

28  government also marked the orange tote bag described in the testimony as Exhibit "2."  Both exhibits

4

1   were returned to government custody and not maintained by the Clerk of the Court.  Photographs

2   depicting the pickup truck pulled over during the traffic stop at issue were marked and admitted as

3   Defendant's Exhibits "B," "C," "D," and "E."

4          Counsel for the defense proposed to call Martin Longabaugh as an expert witness to testify

5   concerning his credentials and a poll he conducted.  The court required counsel for defendant to make

6   an offer of proof concerning his proposed testimony.  Counsel for defendant proffered that the witness

7   conducted a poll of citizens in Clark County based on a hypothetical recitation of facts, asking whether

8   the phrase "I'm good for tonight" was an invocation of a person's right to remain silent.  The defense

9   position is that Rodriguez invoked his right to remain silent unambiguously.  Defense counsel proffered

10  that the poll results would provide the court with evidence regarding what an ordinary person would

11  understand the phrase "I'm good for tonight" means.  The court had counsel for defendant read the

12  question that was posed to persons telephoned during the poll into the record.  The court also had

13  counsel make an offer of proof concerning the results.  Fifty-three percent of the persons polled

14  responded that the man invoked his right to remain silent, forty-three percent responded that the man

15  did not invoke his right to remain silent, and 3.9 percent said they did not know or did not provide an

16  answer.  The court did not admit the testimony, but allowed counsel to mark the curriculum vitae of Mr.

17  Longabaugh as Defendant's Exhibit "F," and the written report of the survey results as Exhibit "G" to

18  preserve the record.  Counsel for defense also proffered that if allowed to testify, Mr. Longabaugh

19  would testify that he has conducted a variety of polls.  The last two polls he conducted regarding a

20  primary election for the Clark County Sheriff's race and a primary election for a Supreme Court race

21  accurately predicted the outcome of both elections.  If allowed to testify, Mr. Longabaugh would also

22  have described the cross section of the community telephonically polled that believed Rodriguez was

23  invoking his right to remain silent and those who thought he was not.  The government opposed

24  admission of the testimony after defense counsel made its proffer on the grounds that the proposed

25  testimony consisted of a legal conclusion for the court to determine.

26  **Testimony of Dustin Gunderson**

27          Dustin Gunderson ("Gunderson") is a United States Park Ranger at Lake Mead National

28  Recreation Area.  He has been employed as a park ranger for three and a half years, and has worked at

5

1    Lake Mead since 2005.  His role as a park ranger is to perform law enforcement and traffic regulation.

2    In that capacity, he was trained in DUI detection in June 2005 by the Las Vegas Metropolitan Police

3    Department and has conducted approximately 10 to 12 DUI arrests.

4         On October 8, 2005, he was patrolling Northshore Road, which is part of 40 miles of a

5    sparsely-populated area that he regularly patrols between mile markers 25 and 47.  With the exception

6    of an area of park services housing and concession housing, the area is wide open, isolated, and

7    desolate. Ranger Bill Reynolds was also on patrol in the same geographic area in a separate patrol car.

8    As he was passing mile marker 29.5 in his patrol vehicle in the late afternoon or early evening,

9    Gunderson observed three people standing next to a parked vehicle by the side of the road.  One of the

10   individuals appeared to be urinating off the side of the road in the bushes.  The vehicle was parked in a

11   pullout near a lookout point with trash cans, but no telephone.  The vehicle he observed was a small

12   blue pickup.

13        Gunderson decided to stop to perform a "welfare check," but was unable to turn around safely to

14   return to the three individuals' location, and drove another half-mile on Northshore Road before

15   completing a u-turn.  It took Gunderson 1-1/2 to 2 minutes to get back to the pullout, but by that time

16   the blue pickup and the three individuals were driving northbound on Northshore Road.  Gunderson

17   followed the pickup and observed it cross the center line four times, and the white fog line several times

18   over a distance of ½ mile.  Based on his training and experience, the number of infractions he observed

19   over this short distance was a clue the driver may be impaired.  Concerned by the multiple traffic

20   infractions, Gunderson decided to conduct a vehicle stop.  This is a very remote windy stretch of road

21   through a wash area.  Gunderson wanted to make sure he would have good radio reception with

22   dispatch, and a fellow officer who was on duty.  He, therefore, followed the blue pickup truck for

23   approximately 3 miles until he was able to get radio communication.  He pulled the vehicle over, using

24   his emergency lights, and contacted dispatch and ran the license plate from his patrol vehicle.

25        After running the license plate, he got out of his patrol car and made contact with the driver of

26   the pickup truck.  He asked the driver, subsequently identified as defendant Rodriguez, for his driver's

27   license, proof of insurance, and registration.  One of his first observations was that Rodriguez was

28   sweating profusely.  Gunderson thought this was abnormal given the time of year and time of day.

6

Gunderson's DUI training included drugs, as well as alcohol, and profuse sweating is a potential concern.  In response to the request for his identification, proof of insurance, and registration for the vehicle, Rodriguez initially handed Gunderson his driver's license and fishing license.  Rodriguez's failure to follow his instruction to provide documents was another clue of impairment.  He observed two other passengers in the vehicle, one in the passenger seat, and another in the back of the cab.  He asked all three if they had any alcohol.  They said that they had alcohol in the vehicle, but nothing opened, in the cooler in the back of the truck.  He later confirmed that the alcohol in the cooler was not opened.  After receiving Rodriguez's driver's license and fishing license, Gunderson asked Rodriguez why he was "sweating so bad."  Rodriguez denied that he was sweating.

Gunderson went back to his vehicle and radioed dispatch with Rodriguez's driver's license information.  Dispatch reported that Rodriguez was a registered felon for robbery.  This information made Gunderson more vigilant about his dealings with Rodriguez.  Gunderson returned to Rodriguez's vehicle and asked Rodriguez whether he had any weapons in the vehicle.  Rodriguez responded he did not.  Gunderson again asked Rodriguez why he was sweating so much, and Rodriguez again responded that he was not.  Gunderson then asked Rodriguez if he was nervous.  Rodriguez replied, "no, do you want to feel my heart?"  That response struck Gunderson as odd.  At this point, Gunderson decided to have Rodriguez get out of the vehicle so he could conduct field sobriety tests.

Rodriguez got out of the vehicle as he was asked.  Gunderson's intention was to conduct the field sobriety tests between Rodriguez's pickup truck and his patrol vehicle which was parked approximately 50 to 70 feet behind the pickup.  Before conducting the field sobriety tests, he asked Rodriguez to open a cooler in the bed of the pickup.  Rodriguez complied, and Gunderson confirmed that there was unopened alcohol in the cooler.  Gunderson also asked Rodriguez to open a tackle box.  When asked on direct examination why he asked Rodriguez to open the cooler and tackle box, Gunderson responded that throughout his encounter with Rodriguez, he was trying to develop a "cooperative rapport" to see if Rodriguez would comply with his requests.  Gunderson stated that he did not direct Rodriguez to do anything, but asked him to open the items to see if Rodriguez was telling him the truth.

/ / /

1    Government counsel marked a clear plastic bag and its contents as Government's Exhibit "1"

2    for identification, and asked Gunderson whether he recognized items contained within it.  The items in

3    the bag consisted of two large knives, a small knife, a Tupperware container with some marijuana in it,

4    and a glass smoking pipe.  The knives were found in the tackle box.  The container with the marijuana

5    in it was found in the orange bag from the bed of the pickup.  He believed the pipe was found in the cab

6    of the truck, but was not sure.

7    When Rodriguez got out of his pickup truck, he walked toward the back of his vehicle and was

8    standing in the middle of the rear of the vehicle behind the tailgate.  Gunderson stood on the driver's

9    side next to the rear tire.  There was no cover on the bed of the pickup, it was a fairly low pickup bed,

10   and he could see into the bed of the pickup from where he was standing.  As Gunderson looked inside

11   the bed of the pickup, he saw coolers, fishing tackle boxes, folding chairs, some fishing poles, and the

12   orange bag.  An orange bag marked as Government's Exhibit "2" was the bag that was in the back of

13   the pickup.  As Gunderson stood outside the truck, looking into the bed, he peered over the top of the

14   bag.  Using a small flashlight, he looked through the back of the truck.  The orange bag was open, and

15   Gunderson saw the handle of a pistol sticking up between some sneakers.  The orange bag was not

16   completely upright but was tipped to the side a little bit.  Gunderson identified the gun depicted in

17   Government's Exhibit "3" as a photograph of the Ruger .22 pistol he confiscated from the orange bag.

18   An apparatus was attached to the barrel of the pistol.

19   After he saw the handle of the pistol inside the orange bag, he immediately grabbed the bag,

20   taking it away from Rodriguez's reach.  He maintained possession of the bag from that point forward.

21   Gunderson then asked Rodriguez if there were any other weapons in the vehicle.  Rodriguez put his

22   head down, looked at the ground, and answered yes.  Rodriguez told Gunderson that there was another

23   weapon underneath his driver's seat.  Keeping an eye on Rodriguez, and trying to keep an eye on the

24   two passengers in the truck, Gunderson slowly walked back, kneeled down on the ground, reached

25   under the seat, and pulled out another weapon.  The passengers were still inside the truck at this point.

26   After retrieving the second firearm, he quickly patted down Rodriguez for weapons and went back to

27   his patrol vehicle, "took a covered position," and called for backup.  Ranger Bill Reynolds was already

28   enroute, and arrived 2 to 5 minutes later.  Once Ranger Reynolds arrived, both rangers conducted a

8

1  felony traffic stop.  Reynolds acted as the cover officer and both rangers drew their weapons.

2  Gunderson went behind Rodriguez, patted him down a second time for weapons, and put him in

3  handcuffs.  The two rangers then ordered the other two passengers out one at a time at gun point, put

4  them in handcuffs, and detained them until everything settled down.  Once the scene was secure,

5  Gunderson advised Rodriguez of his <u>Miranda</u> rights, including the right to remain silent and the right to

6  have counsel.  Rodriguez responded, "I'm good for tonight."  Based on Rodriguez's demeanor and

7  gestures, Gunderson construed the phrase to mean Rodriguez was willing to talk.  Rodriguez spoke with

8  Ranger Reynolds sometime later.  Ranger Reynolds began questioning Rodriguez because Gunderson

9  was contacting his supervisor.

10     On cross-examination, Gunderson explained that the pullout where he initially observed the

11  vehicle was gravel, but was a legal and safe place to stop.  He conceded that he did not know for certain

12  that one of the three individuals he observed was urinating because he was focused on his driving.  He

13  decided to conduct a welfare check to see if the vehicle was broken down, or the individual was

14  urinating, which is a violation of park rules.  As he drove by the pickup, the three men looked at him,

15  but did not flag him down, and he could not confirm whether they needed any assistance.  By the time

16  he turned around and returned, the pickup had left.  He caught up with the pickup at approximately

17  mile marker 31.5 and observed the violations noted in his report between mile marker 31.5 and mile

18  marker 32.  The only violations he observed were crossing the double yellow line and the fog line.  The

19  driving behavior he observed was consistent from the first half mile until he stopped the pickup.  He did

20  not note in his report the infractions observed after the first half mile.  The front and rear tires of

21  Rodriguez's pickup crossed completely over the double yellow line, but the pickup was not entirely in

22  the opposing line of traffic.  In prior reports he has prepared, he has noted the number of feet a vehicle

23  crosses over a double yellow line.  He did not do so in this case.

24     Gunderson has been trained on the three phases of DUI detection.  The first phase is driving

25  behavior.  The second phase is face to face or initial contact with the driver.  The third phase is

26  conducting field sobriety tests, and the pulmonary breath test.  In his face to face contact with

27  Rodriguez after the stop, he did not notice an odor of alcohol or note that Rodriguez's face was flushed,

28  or anything unusual about his eyes.  Rodriguez was not hiccupping, belching, or vomiting, and was

1 cooperative rather than argumentative.  Rodriguez's speech was fair, he sounded coherent, and his

2 speech was not slurred.  When Gunderson asked Rodriguez to get out of the pickup, Rodriguez

3 complied and was not falling over, wobbling, leaning on objects for support, or swaying.  His knees

4 were not sagging.  These are all indicators Gunderson has been trained to look for in DUI cases.

5 Gunderson did not recall asking Rodriguez to blow in his face.  He did not deny doing so, but testified

6 he did not recall doing it.

7       Gunderson noted in his report that Rodriguez did not identify himself as a felon.  At the time of

8 the stop, Gunderson thought felons had to identify themselves to law enforcement, but now knows there

9 is no such requirement.  Rodriguez was not fumbling for his driver's license when asked, and

10 Gunderson believed Rodriguez had it available when he approached the vehicle.  Gunderson had

11 already run the vehicle's plates before he contacted Rodriguez.  With the driver's license, he had

12 everything he needed to run Rodriguez.  Gunderson asked Rodriguez whether he had any alcohol in the

13 truck.  It is illegal in the park to have open containers accessible to the occupants of a vehicle, but

14 alcohol in a cooler in the bed of the pickup truck would not have been accessible.

15       Gunderson did not call for backup when he initially stopped the vehicle, and told dispatch he

16 was "Code 4" which means he was okay at that time.  After Gunderson asked Rodriguez for his driver's

17 license, Gunderson went back to his car and had dispatch run him.  When he received the response from

18 dispatch, he reapproached Rodriguez's vehicle and asked him to step out of the vehicle to continue

19 investigating a DUI.  Gunderson did not perform any field sobriety tests on Rodriguez, and did not

20 recall whether he told Rodriguez of his intention to conduct field sobriety tests.  Of the three phases of

21 DUI detection in which he has been trained, field sobriety tests are the best indicators as to whether or

22 not someone is impaired.  When Rodriguez stepped out of the pickup, Gunderson directed him to the

23 rear of the vehicle.  Rodriguez complied.  Gunderson asked to look inside the ice chest.  Gunderson

24 believed the ice chest was in the rear passenger side of the bed of the pickup, but was not sure.

25 Gunderson did not recall where the tackle box was located in the bed of the pickup.  The truck was

26 completely full with a lot of stuff.  Gunderson stayed on the driver's side the entire time.  Gunderson

27 believes that he asked Rodriguez to open the ice chest, and that Rodriguez complied.  Gunderson did

28 not have Rodriguez sign a consent form.  After Rodriguez opened the ice chest, Gunderson had him

1   open one of the tackle boxes.  When Rodriguez opened the tackle box, Gunderson observed a small

2   knife.  Gunderson felt the type of knife he saw was appropriate for fishing.  Gunderson asked Rodriguez

3   to open the ice chest to confirm Rodriguez was telling him the truth that there was beer in the cooler but

4   it was unopened.  When Rodriguez closed the tackle box, Gunderson asked him to keep at the rear of

5   the vehicle.  At that time, Gunderson was standing at the side of the vehicle with his flashlight, looking

6   in the bed of the truck to see if there were any weapons of any kind for officer safety issues.  While

7   doing so, he first observed the gun in the bag.  He estimated that two minutes elapsed from the time he

8   asked Rodriguez to step out of the vehicle and the time he saw the handle of the gun sticking out of the

9   orange tote bag.  The ice chest and tackle box were opened before he saw the handle of the gun.

10      Gunderson did not call for backup or pat Rodriguez down while Rodriguez was standing at the

11   back of the pickup.  The two passengers remained inside the pickup, and they were not patted down at

12   this point.  Gunderson testified he did not ask Rodriguez to go to the back of the pickup to open

13   anything, but "strategically positioned him at the rear of the truck so that I could observe him."  While

14   he and Rodriguez were there, Gunderson tried to develop rapport with conversation by asking questions

15   about what was in the cooler and if he would mind opening the cooler.  Rodriguez answered "beer,"

16   stated he did not mind opening the cooler and did so.  It was perfectly legal to have alcohol in the bed of

17   the pickup.  This did not aid Gunderson's DUI investigation.  The orange bag was on the floor of the

18   bed of the truck next to the inside wheel well of the rear driver's side tire.  Rodriguez's pickup was not

19   very tall, and he could see the contents of the truck as he stood by it.

20      Gunderson did not ask the passengers to identify themselves until sometime after Rodriguez was

21   out of the pickup.  Gunderson passed the driver's side of the pickup approximately four times from the

22   point of his initial encounter with Rodriguez until asking Rodriguez to step out of the pickup.  During

23   this entire time, he was looking out for his safety, but did not see the gun while he was walking to or

24   from the pickup.  Once Gunderson saw the handle of a gun protruding from the orange bag, he grabbed

25   the bag by the handles and pulled it into his possession for officer safety.  Gunderson ordered

26   Rodriguez to put his hands up where Gunderson could see them.  Gunderson believed he instructed

27   Rodriguez to place his hands on top of the tailgate, and that Rodriguez complied.  Gunderson then

28   asked Rodriguez if there were any other weapons inside the vehicle, and Rodriguez answered yes.

1    Gunderson asked him where it was.  Gunderson conducted a quick pat down in the area around

2    Rodriguez's waist, and accessible areas for weapons before going back to his patrol vehicle.  Rodriguez

3    was not handcuffed at the time.

4         Ranger Reynolds arrived between 2 and 5 minutes after the firearms were located.  After Ranger

5    Reynolds arrived, Rodriguez was placed in handcuffs.  Gunderson read Rodriguez his <u>Miranda</u> rights

6    after the rangers had cleared the vehicle, *i.e.*, after the passengers were removed, patted down, and

7    placed in handcuffs.  After this was done, Gunderson seized another loaded weapon from the pickup.

8    After advising Rodriguez of his <u>Miranda</u> rights, Gunderson asked if he wished to speak.  Rodriguez's

9    answer was "I'm good for tonight."  Rodriguez was the only one who was placed under arrest.  The two

10   passengers were detained and securely placed in different patrol cars.  At this time, Gunderson did not

11   question Rodriguez.  Rodriguez told Ranger Reynolds that the orange tote bag belonged to him, that he

12   had packed the bag, and that the firearm belonged to him.  After <u>Miranda</u> warnings were administered

13   to Rodriguez, there were two other officers assisting on the scene.  Gunderson was in the process of

14   contacting his supervisor on duty that night.  Gunderson believed he was talking to the two passengers

15   when Officer Reynolds questioned Rodriguez.  Gunderson is aware of Rodriguez's responses to

16   Reynolds' questions based on Reynolds' report to him.

17        On redirect examination, Gunderson testified that although this incident started off as a DUI

18   investigation, it did not end up as a DUI.  Only one paragraph of his report discusses the traffic

19   infractions he observed.  The rest of the report deals with the felony stop.  The entire time he followed

20   the pickup truck, he observed multiple traffic violations, not only over the first ½ mile.  The driving

21   behavior was consistent throughout.  Rodriguez was advised of his <u>Miranda</u> rights after being placed

22   under arrest and after the rangers secured the scene.  Gunderson asked Rodriguez if he was willing to

23   talk.  At no point did Rodriguez say "no," "I don't think so," or "I don't think that would be a good

24   idea."  At no point did he request an attorney.  Rodriguez's only response was "I'm good for tonight,"

25   which Gunderson understood to mean it was okay to proceed without an attorney that night.

26        On re-cross examination, Gunderson conceded that there was no need for him to ask Rodriguez

27   to open the ice chest or tackle box to issue a traffic citation.

28   ///

## Testimony of Adante Brown

On October 8, 2005, Adante Brown ("Brown") joined Jose Rodriguez and Jose Padilla ("Padilla") to go fishing at Lake Mead.  The three men drove together, with Rodriguez at the wheel, Brown in the passenger seat, and Padilla in the rear of the cab.  They stopped at a pullout to stretch and take in the view.  He noticed a park ranger vehicle drive by and made eye contact with the ranger.  The three sat there for a few minutes and then got back in their vehicle and continued their drive.

Within 2 to 3 minutes the park ranger vehicle appeared behind them at a high rate of speed, and tailgated the pickup for 5 to 7 minutes before pulling over the pickup.  Brown said the ranger asked Rodriguez if he had been drinking, and Rodriguez said no.  The ranger asked Rodriguez to blow into the ranger's hand, and Rodriguez did.  The ranger then stood back, asked Rodriguez for his license, and went back to the park ranger vehicle.  After the ranger returned, he asked Rodriguez to get out of the truck, and had words with Rodriguez in the back of the pickup, and then the ranger came back and asked Brown for his identification.  The second ranger did not arrive until after the first ranger asked Brown for his identification.  The second ranger pulled Brown out of the car.  Brown identified the photographs marked and admitted as Defendant's "B," "C," "D," and "E" as depicting the pickup truck in which he was riding that night.  An occupant of the pickup can see the bed of the truck through the back seat.  None of the three had been drinking before they were stopped.  After the three resumed their drive, the road had a downhill grade and went straight for approximately twenty feet and then the road was winding.  None of the men had been urinating on the side of the road that evening.

On cross examination, Brown testified that he was a friend of Rodriguez.  On October 8, 2005, he got together with Rodriguez and Padilla approximately 1:00 or 2:00 in the afternoon.  The three met at Brown's house.  Brown had fishing poles, a tackle box, and a duffle bag with clothing for a night of fishing that he put in the truck.  Rodriguez and Padilla already had stuff in the truck when they got to Brown's house.  The three went to a bait shop, got their day license and some bait, and stopped at a Shell station to get sodas, water, and some beer.  Brown estimated the three left Brown's house at 2:20 to 3:00 in the afternoon, spent 20 to 30 minutes at the bait shop, and another 20 or 30 minutes at the gas station.  He did not recall when the ranger stopped the pickup but said it was around dusk because the

/ / /

1   sun was starting to set.  The orange bag marked as Government's Exhibit "2" was not his bag, and

2   Brown did not place anything inside that bag.

3   **Testimony of Jose Padilla**

4         On October 8, 2005, Padilla went fishing with Rodriguez and Brown.  He sat in the pickup truck

5   in a side seat in the back of the cab.  From his vantage point, he could see through a clear glass window

6   into the bed of the truck.  The three pulled over to stretch because it was a long drive, over an hour.

7   They were stopped for approximately five minutes.  They saw a ranger pass by, but did not think

8   anything of it, and got back in the truck and left after a few minutes.  Padilla was not urinating on the

9   side of the road, and did not see anybody else do it.  No one had been drinking that night.  After they

10  had been driving for about a half mile, he saw a ranger car pull up fast behind them.  The ranger car

11  followed them for 1-1/2 to 2 miles.  The road in the area they were driving was weaving through

12  canyons and mountains.  The ranger was about 20 feet behind them, and pulled them over.  The ranger

13  came to the window and asked Rodriguez if he had been drinking.  Rodriguez said no.  The ranger

14  asked Rodriguez to blow in his face, and Rodriguez did.  The ranger took Rodriguez's identification

15  and went back to his truck and then returned.  When the ranger returned, he was "like more aggressive,"

16  and told Rodriguez to get out of the car.  Rodriguez and the ranger went to the back of the pickup.

17  Padilla could see them through the window in the back of the truck where he was sitting.  The ranger

18  opened the ice chest.  Padilla did not see anything else opened in the back of the truck, and the ranger

19  started talking to Rodriguez some more.  Then the ranger started going through stuff in the back of the

20  pickup with his pen, lifting stuff up and moving it around.  The ranger was being nosy and looking at

21  stuff and moving stuff around.  Padilla recognized the orange bag marked as Government's Exhibit "2".

22  He remembered seeing the bag that night in the back of the truck.  He recalled the ranger going through

23  the orange bag "like he saw something" and then stopped.  The ranger then put Rodriguez in handcuffs

24  and took the passengers out at gunpoint.  The three were separated.  Padilla was the last one out of the

25  car.  By the time he was out of the car, there was another ranger present.  Padilla walked backwards

26  toward the rangers, and turned around and told them that he had a gun and it was on the truck's seat

27  where he was sitting.

28  / / /

On cross examination, Padilla testified that he has known Rodriguez all of his life, and they are cousins. Rodriguez picked Padilla up that day at Padilla's house around 2:00 to 4:00 in the afternoon. Rodriguez already had things in the pickup when he arrived. Neither the orange tote bag nor its contents are his. The three men were stopped around sunset. It was dark. Padilla estimated it was approximately a two-hour drive from Brown's house until they were stopped. Padilla was carrying a weapon that night because "we usually go out there a lot" and he often hears coyotes in packs howling. He was not planning on shooting anything but would fire off a warning shot. He had a .40 cal. Glock semi-automatic pistol in the passenger compartment of the pickup where he was seated. It was loaded, but a bullet was not in the chamber. He explained that Glocks do not have safeties and if you keep a bullet in the chamber, you are liable to shoot yourself. The ranger was pointing a flashlight inside the cab of the pickup when he asked "any of you guys got weapons." Padilla recalled some discussion about him being charged with carrying a concealed weapon. Padilla asked the rangers not to lie because he did not have a weapon concealed. When he got out of the pickup and walked back to the officers, he turned completely around with his hands up, letting them know he had a gun in the car under the seat where he was sitting.

While the ranger was shining a flashlight inside the cab and asking about weapons, he did not directly ask Padilla about having a weapon, so Padilla did not lie to the ranger. Padilla did not see the ranger remove the weapon from under Rodriguez's driver's seat, and did not know there was a weapon under the seat. Padilla testified that the orange bag was still in the back of the truck when Padilla got out of the truck. Gunderson left the orange bag sitting in the back of the pickup truck until all three were in handcuffs. Padilla thought that Rodriguez was already in one of the ranger trucks in handcuffs before Padilla and Brown were taken out of the pickup.

On redirect examination, Padilla testified that things may have happened differently than he recalled and that he could not recall the exact order in which things happened. The lights on the ranger's truck were on illuminating the pickup while the ranger was looking in the bed of the pickup.

**Testimony of Robert Mitchell**

Robert Mitchell ("Mitchell") worked as a dispatcher at the 911 center for the National Park Service on October 8, 2005. He did not recall most of the events that transpired that day, although he

15

1  recalled speaking to Gunderson about an incident involving weapons.  He could not recall the reason

2  for the traffic stop.  He said all the dispatch calls are recorded, and are not edited.  Mitchell was played

3  portions of the dispatch tape from October 8, 2005.  He said the radio connection was poor, and so he

4  missed much of the conversation.  He initially wrote down that Gunderson was engaged in a traffic

5  stop, until he later heard that guns were involved.  He did not hear information about a possible DUI.

6  He did not know if Gunderson asked for backup.  He said that part 7 of the dispatch recording was

7  Gunderson calling Reynolds to say that he was "Code 4 at this time," which meant that "everything was

8  fine."  Gunderson also radioed that if Reynolds was free "to roll this way," but that he was "Code 4 at

9  this time."  Radio communications recorded that night indicated two firearms had been recovered from

10  the vehicle and arrests made.

11  On cross-examination, he said he had worked for 6-1/2 years at dispatch.  He explained that

12  multiple events were occurring simultaneously on October 8, 2005, which accounts for the confusion in

13  the recording, as well as his recollection.  He also explained that while Gunderson said he was

14  "Code 4," he also asked Reynolds to "roll this way," which Mitchell described as a call for backup.

15  Mitchell called Gunderson back with information regarding Rodriguez's vehicle check, using code

16  1061, indicating he had sensitive information.  When a dispatcher has sensitive information, he waits

17  until the ranger tells him it is clear to copy, meaning the ranger is away from the individuals stopped.

18  The sensitive information Mitchell relayed to Gunderson was that Rodriguez was registered as a felon

19  twice.  From the transcript of the dispatch recordings, Mitchell testified that Gunderson radioed to

20  Reynolds that he had recovered two firearms, and asked Reynolds' location.  Reynolds responded that

21  he was at mile marker 35 on Northshore Road.  Gunderson responded that he was "still Code 4, I'm still

22  O.K., just head this way."

23  **DISCUSSION**

24  The Fourth Amendment secures "the right of the people to be secure in their persons, houses,

25  papers, and effects against unreasonable searches and seizures."  U.S. Const. amend. IV.  The Fourth

26  Amendment protects reasonable and legitimate expectations of privacy.  Katz v. United States, 389 U.S.

27  347 (1967).  The Fourth Amendment protects "people not places."  Id.  Evidence obtained in violation

28  / / /

16

1  of the Fourth Amendment, and evidence derived from it may be suppressed as the "fruit of the

2  poisonous tree."  Wong Sun v. United States, 371 U.S. 471 (1963).

3  **I.     Traffic Stop and Scope**

4      **A.     The Traffic Stop**

5        A decision to stop an automobile is reasonable where the police have reasonable suspicion to

6  believe a traffic violation has occurred.  Whren v. United States, 517 U.S. 806, 810 (1996).  The

7  defendant concedes that Ranger Gunderson had probable cause to effect a traffic stop of the blue pickup

8  he was driving based upon the traffic infractions Gunderson observed.  The court finds the initial traffic

9  stop was based on probable cause Rodriguez had committed traffic infractions, and was driving

10  erratically.  The traffic stop was, therefore, reasonable within the meaning of the Fourth Amendment.

11      **B.     Scope of the Traffic Stop**

12        The defendant argues that the scope of his detention was not justified by the traffic stop because

13  Ranger Gunderson's questioning of him was not limited to questions reasonably related to the traffic

14  violations he observed.  Rodriguez asserts that Gunderson's observation of erratic driving alone was an

15  insufficient basis upon which to conduct a DUI investigation, and that after Ranger Gunderson made

16  face-to-face contact with him during the stop, Gunderson's suspicion that he was driving under the

17  influence of drugs or alcohol was unfounded.

18        The Supreme Court has held that police contact during an investigatory detention must be

19  reasonably related to the circumstances that initially justified the detention.  United States v. Sharpe,

20  470 U.S. 675, 682 (1985).  "The length and scope of detention must be justified by the circumstances

21  authorizing its initiation."  Pierce v. Multnomah County, 76 F.3d 1032, 1038 (9th Cir. 1996), citing,

22  Terry v. Ohio, 392 U.S. 1, 16, 19 (1968).  "Thus, when an officer has obtained sufficient information to

23  issue a citation, a continued detention without probable cause to arrest for a crime is unreasonable."  Id.,

24  citing, United States v. Luckett, 484 F.2d 89, 90-91 (9th Cir. 1973) (per curiam); McKenzie v. Lamb,

25  738 F.2d 1005, 1008 (9th Cir. 1984); and United States v. Jennings, 468 F.2d 111, 115 (9th Cir. 1972).

26      **1.     Ranger Gunderson's Initial Questions**

27        Rodriguez cites United States v. Perez, for the proposition that an officer must initially restrict

28  questions he asks during a stop to those that are reasonably related to the justification for the stop.

1   37 F.3d 510, 513 (9th Cir. 1994).  He acknowledges an officer may expand the scope of questioning if

2   he notices particularized, objective factors arousing his suspicion.  Id.  He also acknowledges that not

3   every question asked in a custodial setting constitutes an interrogation requiring the administration of

4   Miranda warnings.  United States v. Booth, 669 F.2d 1231, 1237 (9th Cir. 1982).  Although his written

5   motion does not expressly challenge the initial questions Gunderson asked about whether Rodriguez

6   had been drinking or whether he and his companions had drugs, alcohol or weapons in the truck, he

7   does argue Gunderson lacked reasonable suspicion to suspect a driving under the influence infraction

8   from the erratic driving he observed alone.  He challenges the scope of the questions Gunderson asked

9   in general without specifying what questions he contends were impermissible.  For purposes of these

10  findings and recommendation, the court assumes Rodriguez challenges any questions about whether he

11  had drugs, alcohol, or weapons in the truck based on Rodriguez's argument Gunderson lacked

12  reasonable suspicion to conduct a DUI investigation.  Rodriguez responded that he did not have any

13  drugs or weapons, but there were closed containers of beer in the ice chest in the bed of the truck.

14      It is undisputed that Miranda warnings were not administered until after the gun was discovered,

15  and Rodriguez was placed under arrest.  Miranda warnings are necessary when a suspect in custody is

16  interrogated by police.  Thompson v. Keohane, 516 U.S. 99, 102 (1995).  Custodial interrogation is

17  questioning initiated by law enforcement officers after a person has been taken into custody or deprived

18  of his freedom.  United States v. Butler, 249 F.3d 1094, 1098 (9th Cir. 2001), citing, Miranda v.

19  Arizona, 384 U.S. 436, 444 (1966).  In determining whether a suspect was in custody, "the ultimate

20  inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the

21  degree associated with formal arrest."  Stansbury v. California, 511 U.S. 318, 322 (1994), quoting,

22  California v. Beheler, 463 U.S. 1121, 1125 (1983).

23      The determination of whether a defendant is in custody for purposes of the requirement to

24  provide Miranda warnings is determined by examining the objective circumstances of the interrogation.

25  Stansbury, 511 U.S. at 323.  Because the courts are directed to examine the objective circumstances of

26  the interrogation, the subjective views of either the suspect or the interrogating officer are not relevant

27  to the determination of whether the defendant was in custody.  Id.  See also United States v. Leasure,

28  122 F.3d 837, 840 (9th Cir. 1997).  In the Ninth Circuit, the issue of whether a defendant was subject to

18

1  custodial interrogation is a mixed question of law and fact which is reviewed by the Circuit Court of

2  Appeals *de novo*.  United States v. Morino-Flores, 33 F.3d 1164, 1168 (9th Cir. 1994); United States v.

3  Foster, 227, F.3d 1096, 1102 (9th Cir. 2000).

4      The Supreme Court and Courts of Appeals have repeatedly emphasized that many types of

5  questions are not considered interrogation and do not require Miranda warnings.  Questions asked of a

6  motorist temporarily detained in a traffic stop do not require Miranda warnings.  Berkemer v. McCarty,

7  468 U.S. 420, 439 (1984), quoting, United States v. Brignoni-Ponce, 422 U.S. 873, 881 (1975).  In

8  Berkemer, the officer asked the suspect to perform a field sobriety test, and asked if that he had been

9  using intoxicants.  The Supreme Court found Miranda warnings were not required, finding an officer is

10 permitted to ask a suspect in a traffic stop, "a moderate number of questions to determine his identity,

11 and to obtain information confirming or dispelling the officer's suspicions."  Id.  Questions of this

12 nature "cannot fairly be characterized as the functional equivalent of formal arrest."

13      Rodriguez's motion argues that Gunderson only observed traffic infractions for the first half

14 mile he followed the pickup.  However, Gunderson testified he observed the vehicle cross over the

15 center line and fog line multiple times, and that this driving behavior was consistent over the three

16 miles he followed the pickup until making the stop.  The court found this testimony credible.  Before

17 approaching the vehicle, Ranger Gunderson ran the license plate.  After running the license plate, he

18 approached the pickup and asked Rodriguez for his driver's license, vehicle registration, and proof of

19 insurance.  Rodriguez responded to the request for these documents by handing Gunderson his driver's

20 license and fishing license.  Gunderson testified, that based on his training and experience, a motorist's

21 failure to comply with instructions is an indicator of a possible DUI.  One of Gunderson's first

22 observations on making contact with Rodriguez was that Rodriguez was sweating profusely despite the

23 cool temperature at this time of year and time of the evening.  Rodriguez denied that he was sweating.

24 Gunderson also testified that based on his training and experience in DUI investigations, profuse

25 sweating is a possible indicator of being under the influence of drugs.  Rodriguez was asked whether he

26 had been drinking, and denied so.  Gunderson testified he asked all three occupants if they had any

27 alcohol in the vehicle, and was told that there was beer in the cooler in the bed of the pickup, but that it

28 was not opened.

19

1   Gunderson took the driver's license and vehicle information from Rodriguez and returned to his

2   patrol car to have dispatch run a computer check.  The dispatcher advised Gunderson that Rodriguez

3   was a twice-convicted felon.  While testifying, Gunderson did not recall the details of the criminal

4   history results reported by the dispatcher other than Rodriguez had a conviction for robbery.  However,

5   the tape of the radio communications was admitted in evidence as Defendant's Exhibit "H," and a

6   transcript of the radio communications was prepared by the Federal Public Defenders investigator.  The

7   audio recording and transcript reflect the dispatcher reported Rodriguez was a registered felon twice for

8   robbery, perhaps conspiracy to commit robbery, and attempt robbery with deadly weapon and was

9   found in possession of a gun.  When Gunderson returned to the pickup truck after learning about

10  Rodriguez's felony convictions, and criminal history, he asked all three occupants whether there were

11  any weapons in the car, and they each responded negatively.  Padilla testified the ranger did not wait for

12  his response to the question about whether or not he had a weapon, and, therefore, Padilla did not lie to

13  the ranger that night.  The court did not believe Padilla when he testified Gunderson did not wait for his

14  response to the question about whether Padilla had a weapon.  Gunderson again asked why Rodriguez

15  was sweating so bad.  Rodriguez denied he was.  Gunderson then asked whether Rodriguez was

16  nervous.  Rodriguez replied, "no, do you want to feel my heart?" – a response Gunderson thought odd.

17      The court finds Ranger Gunderson's initial questions were reasonably related to the purpose of

18  his stop.  Gunderson initially asked for driver's license, proof of insurance, and registration.  Rodriguez

19  responded by handing him a driver's license and fishing license.  When Gunderson noted Rodriguez

20  was sweating profusely, he asked Rodriguez about it.  Failure to follow instructions and sweating

21  profusely are indicators of a possible DUI.  Ranger Gunderson's observation of the traffic infractions,

22  coupled with these additional observations, reasonably expanded the scope of his questioning to inquire

23  whether Rodriguez had been drinking and had alcohol in the pickup.  These questions were reasonably

24  related to the initial justification for the stop, and appropriately expanded based on his articulated

25  observations.  They are the type of questions asked of a motorist temporarily detained in routine traffic

26  stops which do not require Miranda warnings.  Gunderson asked Rodriguez a moderate number of

27  questions to determine his identity, obtain driver's license and vehicle information, and to confirm or

28  dispel his suspicions that Rodriguez was operating the vehicle under the influence of drugs or alcohol.

20

1  Gunderson expanded the scope of the questioning by asking Rodriguez and his passengers whether

2  there were any weapons in the car only after learning that Rodriguez was a twice-convicted felon for a

3  crime of violence and had a weapons possession charge in his criminal history.  Gunderson's initial

4  questioning of Rodriguez did not violate Rodriguez's Fourth Amendment rights.

5               **2.        Ranger Gunderson's Request that Rodriguez Exit His Vehicle**

6               Rodriguez argues that Gunderson impermissibly expanded the scope of the traffic stop by asking

7  Rodriguez to get out of the vehicle.  Rodriguez contends that after Gunderson's initial face-to-face

8  contact with him, there was no reason to believe Rodriguez may have been under the influence of drugs

9  or alcohol.  The court disagrees.  Gunderson acknowledged that a large number of DUI indicators he

10  has been trained to detect were not present.  Specifically, Gunderson did not note an odor of alcohol,

11  and Rodriguez's face was not flushed.  There was nothing unusual about his eyes, and Rodriguez was

12  not hiccupping, belching, or vomiting and was cooperative rather than argumentative.  Rodriguez's

13  speech was clear, he sounded coherent, and his speech was not slurred.  When Rodriguez got out of the

14  truck, he was not falling over, wobbling, leaning on objects for support, or swaying.  Similarly, his

15  knees were not sagging.  Gunderson did not recall asking Rodriguez to blow in his face, but did not

16  deny having done so.  Brown testified Gunderson asked Rodriguez to blow on his hand.  Padilla

17  testified Gunderson asked Rodriguez to blow in his face.  Thus, both passengers recalled Gunderson

18  asking Padilla to do something in furtherance of a DUI investigation which Gunderson himself did not

19  recall doing, but did not deny.  Counsel for Rodriguez adduced testimony from the ranger, that of the

20  three phases of DUI investigation in which he has been trained, the third phase, conducting field

21  sobriety tests, is the best indicator of whether someone is under the influence of drugs or alcohol.

22               The court finds that the traffic infractions Gunderson observed, coupled with his observations of

23  Rodriguez's profuse sweating, denial that he was sweating, nervousness, failure to follow instructions

24  with respect to the driver's license and vehicle documents requested, and suggestion that Gunderson

25  feel his heart when questioned about being nervous made it objectively reasonable for Gunderson to

26  have Rodriguez get out of the car to conduct field sobriety tests.  The court concludes Gunderson had

27  reasonable suspicion to expand he scope of the traffic stop to conduct field sobriety tests.  The Ninth

28  Circuit defines reasonable suspicion as "specific, articulable facts which, together with objective and

1    reasonable inferences, form the basis for suspecting that the particular person obtained is engaged in

2    criminal activity." United States v. Lopez-Soto, 205 F.3d 1101, 1105 (9th Cir. 2000).  A police officer

3    "is entitled to rely on his training and experience in drawing inferences from the facts he observes, but

4    those inferences must also 'be grounded in objective facts and be capable of rational explanation.'" Id.

5    at 1105.  "Despite a possible innocent explanation for every police officer observation, the stop may be

6    founded on reasonable suspicion."  United States v. Tiong, 224 F.3d 1136, 1140 (9th Cir. 2000).

7    Similarly, "the quantum of proof needed for reasonable suspicion is less than a preponderance of

8    evidence, and less than probable cause."  Id.  Asking Rodriguez to get out of the vehicle to conduct

9    field sobriety tests was based on reasonable suspicion and did not unreasonably expand the scope of the

10   traffic stop.

### 3.    Conduct After Rodriguez Got Out of the Truck

12        It is undisputed that Ranger Gunderson asked Rodriguez to open the ice chest and tackle box in

13   the bed of the pickup after Rodriguez got out of the truck.  It is also undisputed that asking Rodriguez to

14   open the ice chest and tackle box did not further Ranger Gunderson's DUI investigation.  Gunderson

15   also conceded that having alcohol in a cooler in the back of the pickup truck which was not accessible

16   to the occupants was not a violation, and that these requests were not necessary to issue a traffic citation

17   for the offenses he observed.  During his testimony, Gunderson emphasized that he requested rather

18   than required Rodriguez to open these items, and that Rodriguez complied.  Gunderson's requests did

19   not, however, convert the traffic stop into a consensual encounter.  Rodriguez was clearly being

20   detained during an investigatory detention for a DUI and was not free to ignore the police presence and

21   go about his business.  Gunderson's articulated basis for asking Rodriguez to open both items was to

22   develop "cooperative rapport" and to see if Rodriguez was telling him the truth.  Rodriguez stood in the

23   middle of the bed of the pickup while Gunderson positioned himself near the rear driver's side tire.

24        The only testimony in the record concerning the amount of time which elapsed between

25   Rodriguez getting out of the truck and Gunderson's observation of the gun in the orange tote bag came

26   from Ranger Gunderson.  Neither Brown nor Padilla was asked how long Rodriguez and Gunderson

27   were at the bed of the pickup.  Gunderson testified that two minutes elapsed from the time he asked

28   Rodriguez to get out of the pickup until he saw the gun.  During this time, he was looking in the bed of

1  the pickup, and asking Rodriguez to open the ice chest and tackle box.  The question for the court is

2  whether the duration and scope of what occurred in these two minutes was objectively reasonable under

3  the totality of the circumstances.  The court concludes it was.  Gunderson, Padilla, and Brown all

4  testified the bed of the pickup was full of stuff.  The court found Ranger Gunderson credible when he

5  testified he intended to conduct the field sobriety tests between the pickup and his own patrol car which

6  was located 50 to 70 feet behind, and that he looked in the bed of the pickup before initiating the tests,

7  concerned that Rodriguez might have ready access to a weapon.  Gunderson's concern was objectively

8  reasonable given Rodriguez's conduct at the time of the stop, and Gunderson's knowledge of

9  Rodriguez's criminal history.

10      Here, a single ranger pulled over a vehicle containing three male occupants as it was becoming

11  dark.  The area where the stop occurred was remote and isolated.  Gunderson delayed making the stop

12  until he could maintain radio contact with dispatch and another officer on patrol over the same forty-

13  mile stretch of road.  Gunderson observed erratic driving for three miles.  When he made contact with

14  the driver, Rodriguez was sweating profusely but denied it.  Rodriguez handed Gunderson a driver's

15  license and fishing license in response to a request for driver's license, proof of insurance, and

16  registration.  Sweating profusely and failing to follow instructions are both indicators of driving under

17  the influence.  Gunderson returned to the patrol vehicle to run a computer check.  Dispatch advised him

18  that Rodriguez's license was valid, but that he was a twice-convicted felon, and had a conviction for

19  robbery, a crime of violence.  The tape recordings of the radio communications on the date of this

20  incident reflect that Gunderson was told by the dispatcher that Rodriguez was a registered felon twice,

21  one for robbery, and possibly conspiracy to commit robbery, attempted robbery with a deadly weapon,

22  and was also found in possession of a gun.  (See Exhibit "H," audio tape of radio communications, and

23  Memorandum/Transcription of Radio Communication, Exhibit "B" to defendant's Reply (#36), p. 1.)

24      When Gunderson returned to the pickup after receiving this information from dispatch, he asked

25  if any of the occupants had any weapons.  Gunderson testified that he became more vigilant after

26  learning about Rodriguez's criminal history.  Padilla described Gunderson as more aggressive when he

27  returned to the pickup after going to his patrol car.  Gunderson again asked Rodriguez why he was

28  sweating so much and whether he was nervous.  Rodriguez stated he was not nervous and responded

1  "no, do you want to feel my heart," an odd response under the circumstances.  The pickup was full of

2  stuff, and Ranger Gunderson was about to conduct field sobriety tests between the pickup and his own

3  patrol car.  Asking Rodriguez to open the ice chest and tackle box did not advance Gunderson's DUI

4  investigation, but did confirm that Rodriguez was truthful about having closed containers of alcohol in

5  the ice chest.  After Rodriguez showed him the contents of the ice chest and tackle box, Gunderson saw

6  the gun protruding between two sneakers in an open tote bag in the back of the pickup.  It is undisputed

7  from the testimony that the orange tote bag was in the bed of the pickup, exposed to public view.  The

8  occupants of the pickup could see the tote bag through the cab window, and the pickup bed was low

9  enough that any passerby could observe its contents.

10  The court finds that Ranger Gunderson was in a lawful position to view the contents of the open

11  orange tote bag at the time he saw the gun.  Because Gunderson was aware Rodriguez was a convicted

12  felon, the gun was clearly evidence of a crime, possession of a firearm by an ex-felon.  Gunderson had

13  probable cause to believe the gun was evidence after inspecting what was exposed to view in an open

14  tote bag in the bed of the pickup.  See also, United States v. Garcia, 205 F.3d 1182, 1187 (9th Cir.),

15  cert. denied, 531 U.S. 586 (2000) ("the 'plain view' exception requires: (1) that the initial intrusion

16  must be lawful; and (2) that the incriminating nature of the evidence must be immediately apparent to

17  the officer.") (citation omitted).  Gunderson lawfully seized the gun protruding from the orange tote bag

18  under the plain view exception to the warrant requirement.

19  Once the gun was found it was objectively reasonable for Gunderson to ask whether Rodriguez

20  had any other weapons in the pickup.  Miranda warnings are not required when a threat to public or

21  officer safety necessitates immediate questioning.  New York v. Quarles, 567 U.S. 649, 655-56 (1984)

22  (officers' questions about location of gun to man arrested in supermarket wearing empty shoulder

23  holster reasonably prompted by public safety and did not violate Miranda); see also Allen v. Roe, 305

24  F.3d 1046, 1050-51 (9th Cir. 2002) (Miranda not violated when officer reasonably believes there is a

25  serious likelihood of harm to the public or fellow officers).

26  **II.    Defendant's Statements**

27  The court has found that Ranger Gunderson had reasonable suspicion to conduct a DUI

28  investigation, and properly asked Rodriguez to get out of the truck to conduct field sobriety tests.  The

24

1   court has also found that the two-minute interval between the time Rodriguez got out of the truck and

2   Gunderson saw the gun protruding from the open orange tote bag was reasonable in duration under the

3   circumstances presented here.  Similarly, the court has found that the scope of the detention was not

4   unreasonably expanded by Gunderson's view of the contents of the bed of the pickup truck and request

5   that Rodriguez open the ice chest and tackle box for officer safety reasons, and to see if Rodriguez was

6   telling the truth.  Therefore, the fruit of the poisonous tree doctrine does not require suppression of

7   Rodriguez's post-arrest statements.  Rather, the court must decide whether the law enforcement

8   officers' conduct violated his right to remain silent by questioning him after Rodriguez responded "I'm

9   good for tonight" when Miranda warnings were administered to him.

10           **A.      Standard of Review for Waiver of Miranda Rights**

11          Before a defendant's incriminating statements may be admitted in evidence, the Government

12   must establish, by a preponderance of the evidence, that a defendant waived his protection against self

13   incrimination under Miranda.  Colorado v. Connelly, 479 U.S. 157, 158 (1986).  The Ninth Circuit

14   reviews a trial court's legal conclusion concerning whether a defendant waived his Miranda rights *de*

15   *novo*, but reviews the district court's factual determination that the defendant knowingly and voluntarily

16   waived the Miranda rights under the clearly erroneous standard.  United States v. Banks, 282 F.3d 699,

17   705 (9th Cir. 2002).  Whether a person in custody knowingly and voluntarily waives his Miranda rights

18   depends on the totality of the circumstances surrounding the interrogation.  See Fare v. Michael C., 442

19   U.S. 707, 724 (1979); Moran v. Burbine, 475 U.S. 412, 421 (1986).

20           **B.      Rodriguez's Statement in Response to Miranda**

21          Rodriguez argues that he unambiguously invoked his Miranda right to remain silent when he

22   stated he was "good for tonight."  At the evidentiary hearing, counsel for Rodriguez clarified that he

23   does not claim that his response was an attempt to invoke his right to counsel.  During the evidentiary

24   hearing, the court asked counsel for Rodriguez to clarify whether it was his position that officers have a

25   duty to either cease questioning altogether when faced with an ambiguous assertion of the right to

26   remain silent, or limit their questions to those designed to clarify whether the suspect was or was not

27   invoking the right to remain silent.  Counsel for Rodriguez filed an Addendum (#40) after the hearing,

28   stating the defendant's position: "officers have no direct duty to ask questions to clarify the ambiguity,

1    but if they choose not to clarify the ambiguity, they have a duty to stop the general interrogation."

2    (Addendum (#40) 3:10-11.)  Rodriguez's position is that if the officers do not ask questions to clarify

3    whether a suspect is or is not invoking his right to remain silent, "then the officers must 'scrupulously

4    honor' the suspect's wishes and stop the general interrogation."  (Id. at 12-16.)  This result is

5    compelled, it is argued by the Supreme Court's holding in Michigan v. Mosley, 423 U.S. 96, 104

6    (1975), that the admissibility of statements made after a suspect invokes his right to remain silent

7    depends on whether his right to cut off questions was scrupulously honored.

8    Rodriguez also relies on the Ninth Circuit's holding in Nelson v. McCarthy, 637 F.2d 1291

9    (1980), which Rodriguez reads as holding that where an equivocal assertion of a constitutional right has

10   been made, an officer can ask a question to clarify the defendant's wishes, but only so long as general

11   interrogation is not continued.  Id. at 1296.  Rodriguez concedes that the Supreme Court clearly held in

12   Davis v. United States that law enforcement officers have no duty to cease questioning in the face of an

13   ambiguous invocation of the right to have counsel present.  However, he argues that the Davis rationale

14   should not apply to an ambiguous assertion of the right to remain silent, and points out that the Ninth

15   Circuit has specifically left this question open, citing Arnold v. Runnels, 421 F.3d 859, 866 n. 8 (9th

16   Cir. 2005).

17   The government responds that Rodriguez's statement was reasonably construed by Ranger

18   Gunderson as a waiver of the right to remain silent and have counsel present, and that nothing in the

19   rangers' subsequent contact with Rodriguez suggested Rodriguez was invoking any of his Miranda

20   rights.  The government argues that the Supreme Court's rationale in Davis should be extended to

21   claims of encroachment upon a defendant's right to remain silent.  The government cites a series of

22   cases in other circuits holding that Davis' clear articulation rule applies to the right to remain silent, and

23   that a defendant's equivocal invocation of the right to remain silent does not require officers to cease

24   questioning.

25   Gunderson was the only witness who testified concerning how Miranda rights were

26   administered and the circumstances surrounding Rodriguez's response.  He testified that based on

27   Rodriguez's demeanor and gestures he construed the response to mean Rodriguez was willing to talk.

28   It is undisputed Rodriguez did talk to Ranger Reynolds after Brown and Padilla had been removed from

26

the pickup and the scene secured.  It is undisputed that at no time during Reynolds' questioning did Rodriguez state he did not want to talk.  Rodriguez makes no claim that he declined to answer any questions, or attempted to limit the scope of questioning or attempted to terminate questioning. Similarly, Rodriguez does not claim, and there is no suggestion in the record, that either ranger badgered, pressured or coerced Rodriguez to speak.  Just before receiving <u>Miranda</u> warnings he responded to Gunderson's question about whether he had any other weapons by hanging his head and telling Gunderson there was a gun under the driver's seat.  The court, therefore, finds that Ranger Gunderson reasonably construed the response "I'm good for tonight" as a waiver of his <u>Miranda</u> rights based on his observation of Rodriguez's demeanor and gestures and the context in which the response was made.

Additionally, because this statement is susceptible of different meanings, it is, definitionally, ambiguous.  The statement "I'm good for tonight" could reasonably mean "I'm willing to talk tonight" or "I don't want to talk tonight."  Thus, even if another law enforcement officer in Gunderson's position would not have reasonably construed the phrase as a waiver, the court joins those courts which have decided that officers are not required to cease questioning altogether, or to limit questions to clarify whether a suspect intends to invoke the right to remain silent unless the suspect clearly expresses his wish to remain silent.

In <u>Davis</u>, the Supreme Court held that once a law enforcement officer administers <u>Miranda</u> warnings to an individual, that individual must explicitly and unambiguously invoke his or her right to counsel to prevent further police questioning.  512 U.S. at 462.  Law enforcement officers are not required to clarify an individual's ambiguous request.  <u>Id.</u>  The Supreme Court's concern in <u>Davis</u> was to craft "a bright line that can be applied by officers in the real world of investigation and interrogation without unduly hampering the gathering of information."  512 U.S. at 461.  The court reasoned that to require questioning to cease if a suspect makes a statement that might be construed as a request for an attorney would force police officers to make difficult judgment calls about whether the suspect, in fact, wanted a lawyer, and would destroy the benefit of a bright line rule.  The court, therefore, held that "after a knowing and voluntary waiver of <u>Miranda</u> rights, law enforcement officers may continue
/ / /

1 questioning until and unless the suspect clearly requests an attorney." Id.  This court sees no reason to

2 apply a different rule to the right to counsel and the right to remain silent.

3    On the one hand, Rodriguez argues that the holding in Nelson v. McCarthy that "where there

4 has been an equivocal assertion of the constitutional right, the attending officer can ask questions to

5 clarify the defendant's wishes, but then only so long as he does not continue a general interrogation,"

6 637 F.2d 1291, 1296 (9th Cir. 1980), remains good law after Davis.  On the other hand, he argues that

7 the Ninth Circuit has "left open" the question of whether Davis applies to the invocation of a right to

8 counsel, citing Arnold v. Runnels, 421 F.3d at 866 n. 8.    Having reviewed the cases, it is clear that

9 the Ninth Circuit has expressly left open this question.  United States v. Soliz, 129 F.3d 499, 504 n.3

10 (9th Cir. 1997); Evans v. Demosthenes, 98 F.3d 1174, 1176 (9th Cir. 1996); Runnels, supra.

11    The First Circuit has also left open the question, although noting that every circuit that has

12 directly addressed the issue "has concluded that Davis applies to both components of Miranda: the right

13 to counsel and the right to remain silent."  James v. Marshall, 322 F.3d 103, 109 (1st Cir. 2003)

14 (citations omitted).  The Fourth and Fifth Circuits have declined to address whether Davis applies to the

15 right to remain silent.  See Berket v. Angelone, 208 F.3d 172, 200 (4th Cir. 2000); Soffar v. Cockrell,

16 300 F.3d 588, 594 n. 5 (5th Cir. 2002).  However, the circuit courts which have directly addressed the

17 issue have held that the Davis rationale applies with equal force to an invocation of the right to remain

18 silent, and that an ambiguous invocation of the right to remain silent does not require that police cease

19 all questioning.  See Medina v. Singletary, 59 F.3d 1095, 110 (11th Cir. 1995) ("Law enforcement

20 officers are not required to terminate an interrogation unless the invocation of the right to remain silent

21 is unambiguous."); Simmons v. Bowersox, 235 F.3d 1124 (8th Cir. 2001) (to invoke right to remain

22 silent, one must clearly and unequivocally express a desire to remain silent); U.S. v. Johnson, 56 F.3d

23 947, 955 (8th Cir. 1995) ("We consider the defendant's statements as a whole to determine whether

24 they indicate an unequivocal decision to involve the right to remain silent."); U.S. v. Hurst, 228 F.3d

25 751, 760 (6th Cir. 2000) (holding defendant's statements admissible because when viewed objectively

26 under the circumstances his refusal to answer a question about firearms "can hardly be deemed a clear

27 and unequivocal assertion of his right to remain silent in response to any further questions"); U.S. v.

28 Ramirez, 79 F.3d 298, 305 (2d Cir. 1996) (assuming arguendo, without expressly deciding the Davis

1    standard applied to the right to remain silent and upholding trial courts' determination that defendant's

2    non-response to two questions after answering others did not constitute a clear request that all further

3    questioning cease).

4         Miranda v. Arizona held that before the prosecution can admit a defendant's incriminating

5    statement, it must prove that the accused waived his or her right against self incrimination.  The

6    decision created the requirement to administer Miranda warnings which are so well known, that they

7    "have become part of the national culture."  Dickerson v. United States, 530 U.S. 428, 443 (2000).

8    Although the government must prove, by a preponderance of the evidence, that a defendant waived his

9    Miranda rights, an express waiver is not necessary.  North Carolina v. Butler, 441 U.S. 369, 373,

10   375-76 (1979).  Rodriguez relies on the line of cases which have held a defendant may selectively

11   waive Fifth Amendment rights, but that once a defendant has indicated a desire to remain silent, his

12   wishes must be scrupulously honored, to support his arguments.  Miranda teaches that a defendant may

13   invoke the right to remain silent or the right to counsel prior to or during interrogation.  "If the

14   individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain

15   silent, the interrogation must cease."  Miranda, 384 U.S. at 473-74.  In Michigan v. Mosley, the

16   Supreme Court held that Miranda did not create a *per se* rule prohibiting further interrogation once an

17   accused indicates a desire to remain silent, but held that police must "scrupulously honor" a suspect's

18   invocation of the right to remain silent.  423 U.S. 96, 102-04 (1975).  Although law enforcement

19   officers must respect the suspect's desire to cut off questioning, there is nothing in this record to

20   suggest that Rodriguez made any attempt to cut off questioning, or refused to answer any question he

21   was asked.

22        The Ninth Circuit has expressly left open the question of whether the Davis rationale applies to

23   invocation of the right to remain silent, and Nelson v. McCarthy, supra, has not been expressly

24   overruled.  However, the court finds the Eleventh Circuit's rationale in Coleman v. Singletary, 30 F.3d

25   1420 (11th Cir. 1994) persuasive that Davis is a supervening decision which alters the "clarification

26   only" rule.  Prior to its decision in Coleman, the Eleventh Circuit had held that when an individual in

27   custody made an equivocal invocation of his right to remain silent, further questioning must be

28   restricted to clarifying the ambiguous request.  The Eleventh Circuit found that its prior decisions

1    requiring clarification of a suspect's intent upon an equivocal invocation of counsel were no longer

2    good law in light of <u>Davis</u>.  The <u>Coleman</u> court noted that the Supreme Court in <u>Davis</u> rejected a rule

3    requiring police to cease questioning after an ambiguous or equivocal invocation of <u>Miranda</u> warnings

4    because of a fear that the "clarity and ease of application" of a bright line rule would be lost.  The

5    Eleventh Circuit, therefore, found:

6                      Because this concern applies with equal force of the invocation of the

7                      right to remain silent, and because we have previously held that the same

8                      rule should apply in both contexts, we hold that the <u>Davis</u> rule applies to

9                      invocations of the right to remain silent.  A suspect must articulate his

10                     desire to cut off questioning with sufficient clarity that a reasonable

11                     police officer in the circumstances would understand the statement to be

12                     an assertion of the right to remain silent.  If the statement is ambiguous or

13                     equivocal, then the police have no duty to clarify the suspect's intent, and

14                     they may proceed with the interrogation.

15   30 F.3d at 1424.

16           Rodriguez contends that the Supreme Court's subsequent decision in <u>U.S. v. Dickerson</u>,

17   530 U.S. 428 (2000), calls into question the rationale supporting the <u>Davis</u> decision.  The court does not

18   agree.  In <u>Dickerson</u>, the Supreme Court held that Congress could not overrule <u>Miranda</u> by enacting

19   18 U.S.C. § 3501 which predicates admissibility of a defendant's statements on whether or not they

20   were voluntarily made.  The Supreme Court first reviewed § 3501 and concluded that Congress

21   intended to overrule <u>Miranda</u> by its enactment.  The court recognized that if <u>Miranda</u> was regarded as a

22   rule of evidence or procedure, Congress had the power to overrule <u>Miranda</u>.  "Congress retains the

23   ultimate authority to modify or set aside any judicially-created rules of evidence and procedure that are

24   not required by the Constitution."  530 U.S. at 437.  Congress lacks the authority, however, to

25   "legislatively supersede [Supreme Court] decisions interpreting and applying the Constitution."  <u>Id.</u>

26   The Supreme Court recognized that its prior decisions have repeatedly referred to <u>Miranda</u> warnings as

27   "prophylactic," and that language in some of its opinions, including <u>Davis</u>, supported the view that

28   <u>Miranda</u> warnings were not themselves rights protected by the Constitution.  Notwithstanding its prior

1   characterization of Miranda warnings as "prophylactic" and language in other decisions, the court

2   concluded that its decision in Miranda v. Arizona announced a constitutional rule that Congress could

3   not legislatively supersede.

4        In Dickerson, the Supreme Court was invited to overrule Miranda but declined to do so for

5   several reasons.  First, the court relied on the principles of *stare decisis* as weighing heavily against

6   overruling Miranda: "[w]hether or not we would agree with Miranda's reasoning and its resulting rule

7   were we addressing the issue in the first instance." Id. at 443.  The court found no special justification

8   for departing from the precedent which had "become imbedded in routine police practice to the point

9   where the warnings have become part of our national culture." Id.  The court recognized that

10  subsequent cases undermining doctrinal underpinnings create sufficient reason to overrule precedent,

11  but found that this had not happened in its Miranda decisions, stating:

12              If anything, our subsequent cases have reduced the impact of the Miranda

13              rule on legitimate law enforcement while reaffirming the decision's core

14              ruling that unwarranted statements may not be used as evidence in the

15              prosecution's case in chief.

16  Id. at 443-44.

17        Thus, the court rejects Rodriguez's argument that U.S. v. Dickerson undermined the rationale

18  supporting the Davis decision.  Dickerson clearly decided that Miranda's holding was constitutionally

19  based and Congress, therefore, lacked authority to overrule it by enacting § 3501.  Dickerson declined

20  to overrule Miranda while acknowledging that subsequent Supreme Court decisions had reduced the

21  impact of the warnings rule on law enforcement, and that its decision in Elstad v. Oregon, 470 U.S. 298

22  (1985), refused to apply the "fruit of the poisonous tree" doctrine to all Miranda violations.  The court

23  concludes the Davis rationale should be applied to a defendant's invocation of the right to remain silent.

24  The need for a bright line rule officers can apply in the real world of investigation and interrogation

25  applies with equal force to the invocation of the right to remain silent as to the right to counsel.  If a

26  defendant's statement is ambiguous or equivocal, officers have no duty to clarify the defendant's intent,

27  and may proceed to interrogate.

28  ///

31

1   Rodriguez did not clearly indicate in any manner, at any time prior to or during questioning, that

2   he wished questioning to cease.  His <u>Miranda</u> rights were not violated when Ranger Reynolds

3   questioned him after <u>Miranda</u> warnings were administered.

### **CONCLUSION**

5   Ranger Gunderson had probable cause to stop Rodriguez for erratic driving, and developed

6   reasonable suspicion to conduct a DUI investigation.  The scope and the duration of the investigatory

7   detention were objectively reasonable under the totality of the circumstances.  Ranger Gunderson was

8   lawfully in a position to view a gun protruding from the orange tote bag at the time he made the

9   observation.  Because Gunderson was aware Rodriguez was a twice-convicted felon, the incriminating

10  nature of the evidence was immediately apparent, and the gun was, therefore, lawfully seized.  After

11  discovering the weapon, Ranger Gunderson had probable cause to arrest Rodriguez for felon in

12  possession of a firearm.  Rodriguez received and acknowledged his <u>Miranda</u> rights.  Ranger Gunderson

13  reasonably construed Rodriguez's response "I'm good for tonight" as a waiver of <u>Miranda</u> warnings

14  based on Rodriguez's demeanor, gestures, and under the totality of the circumstances surrounding his

15  encounter with Rodriguez.  Additionally, because the response was ambiguous, Rodriguez did not

16  clearly invoke his right to remain silent.  Rodriguez's Fifth Amendment rights were not violated when

17  he was questioned after receiving <u>Miranda</u> warnings.

18  For all of the foregoing reasons,

19  **IT IS THE RECOMMENDATION** of undersigned United States Magistrate Judge that Jose

20  Rodriguez's Motion to Suppress (#25) be DENIED.

21  Dated this 10th day of October, 2006.

22

23  _____

24  PEGGY A. LEEN
    UNITED STATES MAGISTRATE JUDGE

25

26

27

28